The Honorable Barbara J. Rothstein

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ANGELINA SMALLS, et al.,
Plaintiffs,

v.

CITY OF TACOMA and RYAN BRADLEY,
Defendants.

NO. 3:22-cv-5043

ORDER (1) DENYING DEFENDANTS'
MOTION TO DISMISS; AND (2)
GRANTING IN PART AND DENYING
IN PART DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT

I.    INTRODUCTION

This matter comes before the Court on two motions filed by Defendants City of Tacoma and officer Ryan Bradley of the Tacoma Police Department ("TPD") (collectively, "Defendants"): (1) a Motion to Dismiss Plaintiffs' Fifth and Sixth Causes of Action ("Defs.' MTD"); and (2) a Motion for Summary Judgment ("Defs.' MSJ") on all other claims. Dkt. Nos. 38 & 42. Plaintiffs, the Estate of Bennie Branch by and through its personal representative and court-appointed administrator Angelina Smalls, and Brendelin Branch ("Plaintiffs") have filed oppositions to both motions. Their Complaint asserts causes of action under the Fourth and Fourteenth Amendments to the U.S. Constitution and state law, based on an incident involving Brendelin Branch and her son, decedent Bennie Branch, and a traffic stop effected by three TPD officers that culminated in the shooting death of Bennie Branch by one of the officers. Having reviewed the briefs filed in

ORDER

- 1

support of and opposition to both motions, the exhibits filed therewith, and the relevant caselaw, the Court finds and rules as follows.

## II.    BACKGROUND

Just after 2:36 a.m. on September 8, 2019, TPD officer Angel Castaneda, while patrolling near East 35th and East R Streets in Tacoma, Washington, observed an illegally parked white vehicle. *See* TPD Incident Report of A. Castaneda, Ex. A to Valenzuela Decl., Dkt. No. 52. Castaneda pulled up behind the vehicle and approached on foot to investigate what he believed was illegal activity occurring within, including possible firearms violations. Castaneda Decl., Dkt. No. 44, ¶¶ 5, 7. Despite Castaneda's instruction to the vehicle's several passengers to stay inside, one individual got out of the car, and walked over to a red Subaru parked nearby. He got into the front passenger seat of the Subaru, which then drove away. Castaneda, requesting backup, broadcast a description of the Subaru and its passenger, "a black male, approximately 6'1", wearing a red hoodie and blue jeans," over the radio. *Id*. TPD officers Jonathan McNeely and Ryan Bradley, who were in the vicinity, responded to Castaneda's call. *See* Statement of J. McNeely, Ex. F to Valenzuela Decl. As they approached the scene of the original stop, Bradley and Neely observed the Subaru matching Castaneda's description turning onto the road ahead, and with their lights and siren activated, drove up behind the vehicle, which immediately pulled over. *Id*. The officers got out of the patrol car and approached the Subaru on foot, one on each side, shouting to the occupants to show their hands.

According to testimony of the officers on the scene, the testimony of Plaintiff Brendelin Branch, who was driving the Subaru, and audio recording of the officers' real-time radio transmissions, the following events are undisputed. As the officers approached the Subaru, the passenger, who was later identified as Bennie Branch, appeared to be attempting to gain control

ORDER

- 2

of the vehicle by reaching over to the driver's side and stepping on the gas pedal. *See* Dep. of Brendelin Branch, Ex. 2 to Yotter Decl., Dkt. No. 43, 140:25-141:3. Brendelin turned off the engine. The officers, who were by then joined by a third officer, Shawn Gustason, were able to get Brendelin out of the driver's side door and to the ground, where she lay, on her stomach with her feet under or almost under the car, for the duration of the encounter. *See id.*, 147:8-16; 149:2-4. Despite the officers' commands, Bennie did not immediately exit the vehicle, and was tased while in the car at least once or twice. *Id.*, 150; *see* Statement of R. Bradley, Ex. E to Valenzuela Decl., p. 7 of 20. After Bennie exited the vehicle, the officers discovered Bennie had a gun in his pants pocket, and one announced out loud that there was a gun. Branch Dep., 92:15-16. Bennie managed to free himself from the officers and was moving away from them when Bradley fired his weapon ten or eleven times, hitting Bennie seven times, including four times in the back. Bradley Stmnt., p. 18 of 20; Postmortem Exam. Rept., Ex. N. to Valenzuela Decl. TPD Sergeant Christopher Martin arrived within "moments" of the shooting, and approximately a minute after the shooting requested 911 dispatch of priority medical aid. Decl. of C. Martin, Dkt. No. 47, ¶¶ 4, 6. The medical aid unit arrived within five or six minutes, but Bennie died on the scene. Decl. of V. Harrington, Dkt. No. 26, ¶ 7. It was later determined that the gun Bennie undisputedly had in his pants pocket was a $CO_2$ pistol or "BB gun," "designed to look like a semiautomatic handgun." Defs.' MSJ at 10, 13 (citing Dep. of R. Clark, Ex. 7 to Yotter Decl., 123:1-4) ("I'm not critical that the officers would think it's a real gun.").

Brendelin's and the officers' testimonies differ in several ways, but most critically, Brendelin claims that she observed the officers taking the gun from Bennie's pocket and kicking it away *before* Bennie attempted to flee, and that Bennie, unarmed and with his hands visibly empty, was getting up and moving away from the officers and the gun when he was shot. Branch

ORDER

- 3

Dep., 170:11-15. The officers have testified that they discovered Bennie had a gun as they struggled to arrest him, and that they were unable to take the gun away from him until *after* Bradley shot him, and that he was shot as he appeared to be reaching for his gun in his pants pocket. Bradley Statement, p. 7 of 20. In the alternative, Defendants argue that even if Brendelin's testimony that the officers got the gun away from Bennie and kicked it away before he was shot is true, Bennie was running towards the unsecured gun when Bradley shot him. In any event, in the seconds between when the officers determined Bennie had a gun and when the shots were fired, neither Bennie nor the gun were under the officers' control.

The Complaint asserts nine "Claims for Relief," including four federal constitutional claims under 42 U.S.C. § 1983: three under the Fourth Amendment to the U.S. Constitution for unreasonable search and seizure, and one Fourteenth Amendment Substantive Due Process claim; and five state law claims, including wrongful death and survivorship claims for false arrest, battery, negligence, and negligent infliction of emotional distress. Defendants seek dismissal of the Fifth (false arrest) and Sixth (battery) Claims for Relief on statute of limitations grounds, and dismissal of the remaining claims under a summary judgment standard.

## III.    DISCUSSION

### A. Defendants' Motion to Dismiss

#### 1.    Motion to Dismiss Standard

The allegations in a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). On a motion to dismiss under Federal Rule 12(b)(6), a complaint may be dismissed as a matter of law either for lack of a cognizable legal theory or for insufficient facts under a cognizable theory. *Balistreri v. Pacifica*

ORDER

- 4

*Police Dep't.*, 901 F.2d 696, 699 (9th Cir. 1988). In ruling on the motion, a court must "accept all material allegations of fact as true and construe the complaint in a light most favorable to the non-moving party." *Vasquez v. Los Angeles Cnty.*, 487 F.3d 1246, 1249 (9th Cir. 2007). Well-pled allegations in the complaint are assumed to be true, but a court is not required to accept legal conclusions couched as facts, unwarranted deductions, or unreasonable inferences. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986); *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001), opinion amended on denial of reh'g, 275 F.3d 1187 (9th Cir. 2001).

"A claim may be dismissed under Rule 12(b)(6) on the ground that it is barred by the applicable statute of limitations only when 'the running of the statute is apparent on the face of the complaint.'" *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 969 (9th Cir. 2010) (citing *Huynh v. Chase Manhattan Bank,* 465 F.3d 992, 997 (9th Cir.2006). "[A] complaint cannot be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts that would establish the timeliness of the claim." *Id.* (citing *Supermail Cargo, Inc. v. U.S.,* 68 F.3d 1204, 1206 (9th Cir.1995)).

### 2. Fifth and Sixth Claims for Relief: False Arrest/False Imprisonment and Battery

Plaintiffs' Fifth Claim for Relief is for "False Arrest/False Imprisonment (Common Law) (Wrongful Death)"; their Sixth Claim for Relief is for "Battery (Common Law)." Compl. ¶¶ 62-68; 69-73. Defendants seek dismissal of both claims based on the expiration of the two-year statute of limitations applicable to claims for false imprisonment and battery. *See* RCW 4.16.100 ("Actions limited to two years" include "action for libel, slander, assault, *assault and battery*, or *false imprisonment*") (emphasis added). The events giving rise to these claims took place on September 8, 2019; the Complaint was filed on January 20, 2022, nearly two-and-a-half years later.

ORDER

- 5

Plaintiffs argue that this two-year limitations period does not apply to their Fifth and Sixth Claims for Relief because they are actually claims for wrongful death and, Plaintiffs argue, a wrongful death action "has a three year statute of limitations." Pls.' Opp. to MTD at 5 (citing *Deggs v. Asbestos Corp. Ltd*., 186 Wn.2d 716, 722 (2016) (citing *Huntington v. Samaritan Hosp.*, 101 Wn.2d 466, 468 (1984); RCW 4.16.080)). Therefore, before the Court are two questions: (1) whether these two claims are in fact wrongful death claims; and (2) if so, whether in Washington such claims carry a two-year or a three-year statute of limitations.

    *a.   Whether Fifth and Sixth Claims for Relief May Be Construed as Wrongful Death Claims*

In Washington, a "wrongful death" claim is authorized by statute:

> When the death of a person is caused by the wrongful act, neglect, or default of another person, his or her personal representative may maintain an action against the person causing the death for the economic and noneconomic damages sustained by the beneficiaries listed in RCW 4.20.020[1] as a result of the decedent's death.

RCW 4.20.010. Defendants argue that the two claims at issue cannot be deemed wrongful death claims merely by virtue of the "ambiguous references to 'wrongful death'" in the Complaint. Defs.' MTD at 4. The Court does not find these references as "ambiguous" as Defendants suggest. The Fifth Claim for Relief explicitly and prominently references "Wrongful Death" in its heading:

<u>**FIFTH CLAIM FOR RELIEF**</u>

**False Arrest/False Imprisonment (Common Law)**

**(Wrongful Death)**

Compl. at 12. The Fifth Claim for Relief also states "Plaintiffs are seeking both survival and wrongful death damages under this claim." *Id*., ¶ 68. While the Sixth Claim does not similarly

---

[1] These include "the spouse, state registered domestic partner, child or children, including stepchildren, of the person whose death shall have been so caused. If there is no spouse, state registered domestic partner, or such child or children, such action may be maintained for the benefit of the parents or siblings of the deceased."

1   include the phrase "wrongful death" in its heading, it also sufficiently puts Defendants on notice

2   that "Plaintiffs bring this claim both individually and as a successors-in-interest to DECEDENT,

3   and seek both survival and wrongful death damages." *Id.*, ¶ 73.

4        Federal Rule 8(a) provides, in relevant part, that "[a] pleading that states a claim for relief

5   must contain: a short and plain statement of the claim showing that the pleader is entitled to relief;

6   and . . . a demand for the relief sought." Generally speaking, the "minimal notice pleading

7   requirements of Rule 8 . . . requires the plaintiff to set forth in his complaint *claims for relief,* not

8   causes of action, statutes or legal theories. . . . A complaint need not identify the statutory or

9   constitutional source of the claim raised in order to survive a motion to dismiss." *Alvarez v. Hill*,

10   518 F.3d 1152, 1157 (9th Cir. 2008) (citations omitted). "[T]he statement need only "'give the

11   defendant fair notice of what the ... claim is and the grounds upon which it rests.'" *Erickson v.*

12   *Pardus*, 551 U.S. 89, 93 (2007) (citing Twombly, 550 U.S. at 555).

13        Under this liberal pleading standard, the Court concludes that Plaintiffs' Claims Five and

14   Six are adequately stated to provide notice to Defendants that Plaintiffs are asserting wrongful

15   death claims. Defendants have not provided, and the Court was unable to identify, any authority

16   for the proposition that a wrongful death claim must be pled with any heightened particularity.

17   Both claims plainly reference Plaintiffs' intent to seek "wrongful death" damages. Under the

18   Federal Rules' liberal notice pleading standard, these references are sufficient to put Defendants

19   on notice that these two claims are brought as wrongful death claims.

20        *b.   Whether Plaintiffs' Wrongful Death Claims' Limitation Period Is Two or Three Years*

21        Defendants argue that even if Plaintiffs have sufficiently pled wrongful death claims, they

22   are based on claims for false imprisonment and battery, and therefore are subject to the two-year

23   statute of limitations explicitly codified for such claims at RCW 4.16.100.

24   ORDER

25   - 7

1   Washington courts have repeatedly asserted, however, that "[t]he statute of limitations for

2   a wrongful death action in Washington is three years. *Atchison v. Great W. Malting Co.*, 161 Wn.

3   2d 372, 377 (2007) (citations omitted). This period comes from the so-called "catch-all" provision

4   at RCW 4.16.080(2), which provides a three-year limitation on claims for "[a]n action for taking,

5   detaining, or injuring personal property, including an action for the specific recovery thereof, or

6   for any other injury to the person or rights of another not hereinafter enumerated."

7   It is Defendants' position that the statute of limitations for false imprisonment and battery

8   are in fact "hereinafter enumerated"—specifically, as noted above, at RCW 4.16.100. Washington

9   Courts have long and repeatedly asserted, however, that it is the claim of wrongful death, not the

10  personal injury claim underlying it, that determines the applicable limitations period. *See, e.g.,*

11  *Robinson v. Balt. & Seattle Mining & Reduction Co.*, 26 Wash. 484, 490–91 (1901); *Dodson v.*

12  *Cont'l Can Co.*, 159 Wash. 589, 592 (1930); *Cook v. Clallam County*, 27 Wn.2d 793, 795 (1947);

13  *Huntington*, 101 Wn.2d 466, 468–69; *White v. Johns–Manville Corp.*, 103 Wn.2d 344, 348

14  (1985); *Beal v. City of Seattle*, 134 Wn.2d 769, 776 (1998); *Atchison*, 161 Wn.2d at 377. Because

15  there is no statute of limitations "hereinafter enumerated" for wrongful death claims, the three-

16  year catch-all provision applies.

17  It is true that under certain specific conditions, courts have recognized exceptions to this

18  rule. In *Fast v. Kennewick Public Hospital District*, for example, the Washington Supreme Court

19  held that the medical negligence statute of limitations, not the wrongful death statute of limitations,

20  applied to a wrongful death claim premised on medical negligence. 187 Wn.2d 27, 35 (2016). That

21  holding was based on the "broad language" of the medical negligence statute, which provides a

22  special statute of limitations for "*[a]ny* civil action for damages for injury occurring as a result of

23  health care." *Id*. (citing RCW 4.16.350) (emphasis added). *Fast* did not announce a general rule

24  ORDER

25  - 8

concerning the statute of limitations for wrongful death claims; it merely "carv[ed] out a special statute of limitations for wrongful death causes of action based on medical negligence . . . based on unique statutory language and was therefore inapplicable to other types of wrongful death claims." *Fechner v. Volyn*, 3 Wn. App. 2d 716, 721 (2018) (citing *Fast*, 187 Wn.2d at 43). As Justice Madsen observed in her concurrence in *Fast*, the court's decision was limited to the context of health-care-related claims:

> This court has long recognized that the general torts (catchall) three year statute of limitations (SOL) applies to wrongful death claims. . . . Outside of the health care context, however, the general torts catchall three year SOL still applies. . . . [T]his case is not an invitation to go behind any wrongful death action to the underlying harm in search of a potentially more favorable SOL. As noted, *in all other contexts outside of death resulting from health care, the wrongful death action remains subject to the three year limitation period of RCW 4.16.080(2)*.

*Id*. 187 Wn.2d at 42–43 (Madsen, J., concurring). Accordingly, the Court holds that Plaintiffs' wrongful death claims set forth in their Fifth and Sixth Claims for Relief are governed by the three-year statute of limitations of RCW 4.16.080(2), and Defendants' motion to dismiss on the grounds that the statute of limitations has run is denied.[2]

## B. Defendants' Motion for Summary Judgment

### 1. Summary Judgment Standard

A motion for summary judgment should be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of demonstrating the absence of a triable issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[C]ourts may not resolve genuine disputes of fact in favor of the party

---

[2] The Court does note that the two-year statute of limitations on any claims for battery and false imprisonment Bennie may have had were in fact expired by the time Plaintiffs filed their Complaint, and that the statute of limitations on any such survivorship claims Plaintiffs may have intended to pursue has in fact run.

ORDER
- 9

seeking summary judgment." *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

"Because [the excessive force inquiry] nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005) (citing, inter alia, *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002)).

### 2.   Second Claim for Relief: Fourth Amendment Excessive Force

#### a.   *Whether There Is a Dispute of Fact Regarding Reasonableness of Bradley's Use of Deadly Force[3]*

A Fourth Amendment claim that law enforcement officers have used excessive force is analyzed under a "reasonableness" standard. *See Graham v. Connor*, 490 U.S. 386 (1989). The reasonableness inquiry in an excessive force case is an objective one: "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them[.]" *Id*. at 397 (citations omitted).  In *Graham*, the Supreme Court outlined several factors to be used in weighing reasonableness in excessive force cases, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." 490 U.S. at 396. The threat element is the most important consideration, and "[a]n officer's use of deadly force is reasonable only if 'the

---

[3]There is no dispute that Bradley's firing his weapon at Bennie was deadly force. Plaintiffs also initially appear to have claimed a constitutional violation based on the officers' other uses of force (*e.g.* use of a taser) during the incident. *See* Compl., ¶ 33 (alleging Defendants' "unjustified use of force against DECEDENT, both deadly and non-deadly"). However, Plaintiffs do not respond to Defendants' Motion for Summary Judgment on issue of the use of non-deadly force, *see* Defs.' MSJ at 19-20, and any such claims are therefore deemed abandoned.

officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.'" *Gonzalez v. City of Anaheim*, 747 F.3d 789, 793 (9th Cir. 2014) (quoting *Tennessee v. Garner,* 471 U.S. 1, 3 (1985)). The question on summary judgment "is whether a reasonable jury would necessarily find that [the officer] perceived an immediate threat of death or serious physical injury at the time he shot" the decedent. *Id.*, 747 F.3d at 794. Defendants argue that the available evidence could lead a reasonable jury to only one conclusion: that the officers reasonably perceived Bennie posed an immediate threat to their life and safety.

The Court concludes, viewing the evidence before the Court in a light most favorable to Plaintiffs, that a reasonable jury could find that at the time he was shot, Bennie did not pose an immediate threat to the officers. The testimony of the officers on the one hand and Brendelin Branch on the other differs in several ways, but the most conspicuous dispute of material fact regarding the "immediate threat" inquiry, precluding summary judgment, is this: crediting Brendelin's testimony that the officers had already taken the gun and kicked it away before Bennie got up to run and was shot, was Bennie running towards his gun when he was shot and therefore, at least arguably, a threat to their safety? Or, as Brendelin's testimony indicates and Plaintiffs argue, was he unarmed and attempting to flee the scene, in a direction other than towards the gun?

According to Brendelin's testimony and other circumstantial evidence before the Court, at the moment shots were fired, Bennie neither had possession of his gun nor was attempting to gain possession of the gun; he was running away with his back to the officers; and his hands were empty. Branch Dep., 172:2-19; 181:1-2; 184:2-14; 188:16-21. In the moments leading up to the shooting, Bennie had not struck or moved towards the officers, and had not verbally threatened them in any way. Bradley Stmnt., p. 13 of 20; Branch Dep., 213. In seeking summary judgment, Defendants attempt to call Brendelin's testimony into question, both by mischaracterizing it and

ORDER

- 11

by claiming it is blatantly disputed by objectively verifiable evidence. Neither strategy succeeds in eliminating the dispute of fact on the question of immediate threat.

First, while Defendants repeatedly claim that Brendelin testified that Bennie was running towards the gun after the officers kicked it away, the evidence provided to the Court simply does not support this characterization of her testimony. For example, Defendants argue that "[u]sing Brendelin's account, Bennie was running in the same direction the unsecured gun was now located." Defs.' MSJ at 9 (citing Branch Dep., 172:13-17; 181:23-182:3; Ex. 3 to Yotter Decl.). However, in support of this critical allegation, they cite only (1) Brendelin's testimony that after the officers kicked away the gun, "Bennie got up and ran to the middle of the street" and "started running and was going to try to take off to the right"; and (2) Exhibits 12A and 12B to Brendelin's deposition. But Brendelin's cited testimony does not support Defendants' position that Bennie was running towards the gun, because it is not clear from the record before the Court what Brendelin means by "to the right" (as what "to the right" means would depend, obviously, on which direction one—presumably but not necessarily the speaker—is facing, which is not clear from the record); or where exactly Brendelin is alleging the gun was at that point. Regarding the exhibits, the first is a photograph of the scene with two "X"s drawn near the Subaru, and two parallel arrows, one in blue and one in yellow, pointing away from the Subaru, towards the middle of the street:



ORDER

- 12

Ex. 3 to Yotter Decl., Dkt. No 43. It is not necessarily reflected in the record, however, what Brendelin's testimony regarding this exhibit might have been, or what these arrows or Xs are intended to represent, as the deposition transcript excerpt provided to the Court makes no reference to Exhibit 12A. Adding to the confusion, Exhibit 12B (also not referenced in the deposition excerpt provided) is the same photograph, this time with two arrows, in blue and yellow, drawn to form an approximate 45 degree angle:



*Id*. For similar reasons, it is not evident from this exhibit either that Brendelin was conceding that Bennie was running towards the gun.

And in fact, Brendelin has testified to the contrary:

Q: When the officer kicked Bennie's gun away, which direction did he kick Bennie's gun? . . .

A: I can't remember was it right to the left, but he kicked it away from Bennie. As he moved it, kicked it away from Bennie, Bennie got up the opposite way, ran to the middle of the street to where he was trying to run to the right, and they shot him.

Branch Dep., 184:2-14. Taken together and in a light most favorable to Plaintiffs, the non-moving party, Brendelin's testimony is that the gun was taken off Bennie's person before he was shot. Further, the testimony may be ambiguous regarding which direction the gun was kicked, but

ORDER

- 13

unequivocally states that it was "kicked away from Bennie" and that "Bennie got up the opposite way." This is sufficient to create an issue of fact regarding whether Bennie was running towards the gun, or attempting to flee in the opposite direction.

Second, Defendants claim that the officers' testimony is corroborated by the audio transmissions, recorded during the incident by "South Sound 911." According to Defendants, under the Supreme Court's ruling in *Scott v. Harris*, this "objectively verifiable" audio "blatantly contradicts" Brendelin's testimony and may therefore be used to resolve, even on summary judgment, any disputed fact in Defendants' favor. 550 U.S. 372, 379-80 (2007) (finding that authenticated video of a car chase showing "vehicle racing down narrow, two-lane roads in the dead of night at speeds that are shockingly fast. . . , swerve[ing] around more than a dozen other cars, cross[ing] the double-yellow line, and forc[ing] cars traveling in both directions to their respective shoulders to avoid being hit" that "quite clearly contradict[ed]" non-moving party's testimony that "there was little, if any, actual threat to pedestrians or other motorists" may be considered in granting summary judgment).

However, Defendants' discussion of the audio evidence is muddled at best, and the Court concludes that this evidence falls far short of the "blatantly contradictory" standard contemplated in *Scott*. According to Defendants, the audio indicates that "[a]t 2:40:58:43 a.m. Officer Gustason broadcast 'he's got a gun.'" Defs.' MSJ at 8. Defendants next assert "[j]ust 9 seconds later after his last transmission – at approximately 2:40:08:43 [*sic*], Officer Gustason made another radio broadcast announcing, 'shots fired subject down.'" *Id*. Defendants argue that no reasonable jury could believe that Brendelin's version of events took place in the mere "9 seconds that elapsed between the broadcasts." *Id*. The Court does not share Defendants' confidence on this point.

ORDER

- 14

The first problem is that the second time stamp as represented by Defendants is not "9 seconds" after the first, even assuming that "2:40:08:43" is a typo that should read "2:41:08:43" (which is an assumption that the Court is hesitant to make on such a critical detail). It is ten seconds. Moreover, it is not clear from the record how the accuracy of the time stamps can be verified. The only reference provided to the Court—Gustason's statement in his declaration that "[b]ased on the time stamp from South Sound 911's system, this broadcast began at exactly 2:40:58:43 a.m."—lacks foundation, among other evidentiary flaws. *See* Gustason Decl., ¶ 16. And in fact, the second time stamp (assuming Defendants meant 2:41:08:43) appears to be contradicted by the "CAD printout" submitted by Plaintiffs, which indicates that "shots fired" was announced at 2:41:21. *See* Ex. D to the Valenzuela Decl. Most importantly, even assuming that both time stamps are accurate as Defendants intended to represent them, and are ten seconds apart, there is simply nothing in the record currently before the Court that would require a reasonable jury to find that Brendelin's version of events—including that (1) an officer discovered and announced a gun during a pat-down and kicked it away; (2) Bennie freed himself and got up to begin running away in the opposite direction; and (3) Bradley fired ten or eleven shots at the fleeing Bennie—necessarily took longer than ten seconds. That is to say, the audio transmission time stamps—typographical and evidentiary flaws aside—do not "blatantly contradict" Brendelin's testimonial evidence under *Scott*, and may not be relied upon at summary judgment to discredit the non-moving parties' version of events.[4]

---

[4] Defendants' version of the facts concerning discovery of the gun contains several additional points of confusion. While in their motion they claim that the audio proves "it was Gustason . . . who discovered the gun in Bennie's possession," and Gustason states in his declaration that he is the one who discovered and announced the gun, according to a statement Bradley made days after the incident to the Pierce County Sheriff's Department, which was conducting an investigation at TPD's request, it was McNeely who shouted "he's got a gun." *See* Gustason Decl. ¶ 14 ("Still trying to maintain control of his arm but also take him down to the ground, I felt what I believed to be a gun in his left front pocket as I wrapped my arms around his waist briefly. As soon as I recognized that the

ORDER

- 15

Even according to Defendants, "Bennie did suffer gunshot wounds to the back, and he may have been in the process of attempting to flee after the shots began." Defs.' MSJ at 15. Bradley does not recall seeing a weapon in Bennie's hands. Bradley Dep., Ex. J. to Valenzuela Decl., 23:15-17 (Q: "At any time before you fired your shot, did you actually see a weapon in Mr. Branch's hands? A: Not in his hand, no."). Further, a jury might also consider that while the officers had no reason to know the weapon in Bennie's possession was not a real gun (and the reasonableness of them perceiving a threat must be evaluated accordingly), Bennie most certainly *did* know it was a BB gun—making the officers' claims that Bennie was either running towards it or reaching for it in his pocket in an ill-advised attempt at self-defense that much less plausible. *See* Dep. of R. Clark, 123:1-2 ("Why would a guy go for a BB gun that he knows is not a gun in this set of facts?"); *Cruz v. City of Anaheim*, 765 F.3d 1076, 1079 (9th Cir. 2014) ("In this case, there's circumstantial evidence that could give a reasonable jury pause. Most obvious is the fact that Cruz didn't have a gun on him, so why would he have reached for his waistband? Cruz probably saw that he was surrounded by officers with guns drawn. In that circumstance, it would have been foolish—but not wholly implausible—for him to have tried to fast-draw his weapon in an attempt to shoot his way out. But for him to make such a gesture when *no* gun is there makes no sense whatsoever."). Based upon the evidence provided to the Court, a reasonable jury could believe Brendelin's testimony that the gun had been kicked away and Bennie was unarmed and fleeing the scene, not running towards the gun, at the time he was shot in the back, and that he therefore posed no immediate

---

individual was possibly armed, I broadcast over my radio 'He's got a gun.'"); *but see* Ex. E to Valenzuela Decl., at p. 7 of 20 ("McNeely shouted out, gun, gun, he's got a gun."). McNeely's statement for the investigation corroborates Bradley's recollection that it was McNeely—not Gustason—who discovered and announced that Bennie had a gun. See Ex. F to Valenzuela Decl., pp 8, 15 of 342 ("The whole time I'm saying don't reach for it, don't reach for it, he's got a gun Ryan, he's got a gun. I'm just yelling that to Ryan. . . . I wanted to let Sean and Ryan know, Officer Gustason know, that this guy had a gun.").

ORDER

- 16

threat to the life or safety of the officers at the scene. Summary judgment on Plaintiffs' excessive force claim is therefore denied.

### b. Whether Defendant Bradley Is Entitled to Qualified Immunity

In resolving questions of qualified immunity, courts "engage in a two-step inquiry." *Peck v. Montoya*, 51 F.4th 877, 887 (9th Cir. 2022). One issue is whether, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201 (2001). As outlined above, this first question has been answered in the affirmative.

Thus only the second issue in a qualified immunity inquiry remains: whether at the time of the alleged constitutional violation, that right was clearly established "in light of the specific context of the case." *Scott,* 550 U.S. at 377. Defendants argue that there is no clearly established right to be free from deadly force, "where [a suspect] is struggling with officers after a gun has been found on him, and he reaches for the gun during the struggle, and then defeats their efforts to handcuff him." Defs. MSJ at 18. This argument fails for two reasons. First, the Court must rely on the non-moving party's version of the facts even in deciding qualified immunity, and here, the evidence is disputed as to whether Bennie ever actually attempted to reach for his BB gun. Branch. Dep., 213:6-9 ("Q. At any point, ma'am, did you ever see your son reach either into his waist or into his pockets at any point during this incident? A. No, sir."). Indeed, it is disputed whether the officers were in fact attempting to handcuff Bennie. Branch Dep., 178:22-24 ("Q. And the officers, from your perspective, never tried to handcuff. A. No."). Critically, as detailed more fully above, there is a dispute as to whether Bennie was "struggling with officers after a gun has been found," or whether he was simply attempting to flee after the gun was found.

ORDER

- 17

Second, Defendants have attempted to define the right that Plaintiffs are claiming is "clearly established" at too high a level of specificity. The Ninth Circuit has explained that "a violation is obvious enough to override the necessity of a specific factual analogue" when "it is almost always wrong for an officer in those circumstances to act as he did." *Sharp v. Cnty. of Orange*, 871 F.3d 901, 912 (9th Cir. 2017). It has been well-settled for almost forty years that an officer may not use deadly force on a fleeing, unarmed suspect who poses no immediate threat. *Garner*, 471 U.S. at 4. "[F]ew things in our case law are as clearly established as the principle that an officer may not 'seize an unarmed, nondangerous suspect by shooting him dead' in the absence of 'probable cause to believe that the [fleeing] suspect poses a threat of serious physical harm, either to the officer or to others.'" *Torres v. City of Madera*, 648 F.3d 1119, 1128 (9th Cir. 2011) (quoting *Garner*, 471 U.S. at 11). Indeed, at the time of the shooting, caselaw would have made it "clear to a reasonable officer" that "a police officer may not use deadly force against a non-threatening individual, *even if the individual is armed*, and even if the situation is volatile." *Est. of Aguirre v. Cnty. of Riverside*, 29 F.4th 624, 629 (9th Cir. 2022) (citing *Hayes v. Cnty. of San Diego*, 736 F.3d 1223, 1227–28 (9th Cir. 2013); *George v. Morris*, 736 F.3d 829, 832–33, 839 (9th Cir. 2013)) (emphasis added); *see also Curnow By & Through Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991) (under witness's "version of the shooting, the police officers could not reasonably have believed the use of deadly force was lawful because Curnow did not point the gun at the officers and apparently was not facing them when they shot him the first time.").

Taking the facts in the light most favorable to Plaintiffs, as is required at this stage, Bradley used deadly force on Bennie Branch while Bennie was unarmed and attempting to flee—running not towards his gun, but away from the officers—with his back to the officers and his hands empty.

ORDER

- 18

According to Brendelin's testimony, Bennie never had a weapon in his hands, never struck the officers, and never threatened the officers with a weapon, either verbally or physically. It is undisputed that four shots hit Bennie in the back. That the Constitution does not permit the use of deadly force under these circumstances was clearly established at the time of these events, and Bradley is therefore not entitled to the protections of qualified immunity.

### 3.  First Claim for Relief: Unreasonable Search and Seizure—Detention and Arrest

Plaintiffs assert that the officers' detention and attempted arrest of Bennie Branch when they pulled over the Subaru amounted to unlawful seizures in violation of the Fourth Amendment. Compl. ¶¶ 25-31. Defendants seek dismissal of these claims, arguing that the officers had a reasonable suspicion supporting the detention, and probable cause supporting the attempted arrest. The Court addresses each claim in turn.

First, Defendants argue that Bradley and McNeely had a reasonable suspicion to detain Bennie Branch. *See United States v. Sokolow*, 490 U.S. 1, 7 (1989) ("[P]olice can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity "may be afoot," even if the officer lacks probable cause.") (citing *Terry v. Ohio,* 392 U.S. 1, 30 (1968)). In support of this assertion, Defendants allege the following facts, which are undisputed and supported by the record. During the initial investigation involving the white vehicle, fellow TPD officer Angel Castaneda ordered the vehicle's passengers to stay inside the car, but Bennie did not comply and instead got out of the car, and walked over and got into the red Subaru, which drove away. *See* Castaneda Decl., ¶¶ 9-11. Castaneda further alleges that Bennie had been "holding his waistband as if concealing something" that Castaneda "suspected [] was a weapon." *Id*. Castaneda's declaration states that he "[w]anted the vehicle stopped in connection with a firearm investigation and suspect[ed] the fleeing individual was in

ORDER

- 19

possession of a firearm," so he "broadcast a detailed description of the individual, a physical description of the vehicle, a description of the direction the vehicle was traveling." *Id.*, ¶ 15. Hearing this broadcast, McNeely "understood that Officer Castaneda wanted that vehicle stopped in connection with a firearm investigation." McNeely Decl., ¶10. These facts are undisputed. Although Plaintiffs attempt to cast doubt on Defendants' claim that Castaneda actually conveyed that he wanted the Subaru stopped, the only reasonable inference to be drawn from Castaneda's explicit description of Bennie, the vehicle he was driven away in, and the direction the vehicle was driving, is that Castaneda wanted it stopped, just as McNeely understood. McNeely Decl., ¶ 10.[5]

Plaintiffs do not dispute Defendants' claim that at some point, Castaneda had reasonable suspicion to support a lawful stop of the Subaru. Under the "collective knowledge" doctrine, this reasonable suspicion may be imputed to Bradley and McNeely. *See United States v. Villasenor*, 608 F.3d 467, 475 (9th Cir. 2010) ("[W]here an officer ... with direct personal knowledge of *all* the facts necessary to give rise to reasonable suspicion ... directs or requests that another officer ... conduct a stop, search or arrest," courts may "impute police officers' collective knowledge to the officer conducting a stop, search, or arrest.") (citing *United States v. Ramirez,* 473 F.3d 1026, 1032-33 (9th Cir.2007). Plaintiffs do argue that when Castaneda discovered a firearm on the driver of the white vehicle during the first stop, at that point "the gun investigation should have concluded and there was no longer any reason to detain any other individual, including Decedent." Pls.' Resp. at 11. But Plaintiffs do not explain how the investigation was suddenly and necessarily "concluded" once a single firearm was found, as Bennie presumably remained, at the very least, a witness; and they ignore the other facts underlying Castaneda's reasonable suspicion: that Bennie

---

[5] Plaintiffs' expert agrees. *See* Dep. of R. Clark, Ex. 14 to Supp. Yotter Decl., 85:17-86:9.

ORDER

- 20

himself was suspected of carrying a weapon, and had exited the vehicle and fled the initial investigatory stop in contravention to Castaneda's explicit and undeniably lawful order. These facts meet the "minimal level of objective justification" supporting the officers' reasonable suspicion, and therefore their initial detention of the Subaru did not violate Plaintiffs' Fourth Amendment rights. *Sokolow*, 490 U.S. at 7 (1989).

Second, Defendants argue that once the officers had stopped the Subaru and observed the struggle for control of the vehicle taking place inside, they had probable cause to arrest Bennie. According even to Brendelin's testimony, Bennie was attempting to take control of the Subaru and flee after the officers effected a lawful stop. Bennie refused the officers' orders to get out of the vehicle and at a minimum, continued to "wrestle" with the officers as they endeavored to detain him. Branch. Dep., 145:22-24. Plaintiffs fail to provide any substantive argument supporting their conclusory assertion that "Bradley lacked . . . probable cause to [] arrest Decedent in the first place." Pls.' Resp. at 11. The Court concludes that the undisputed events occurring after the officers pulled the Subaru over supported probable cause to arrest Bennie, and that Plaintiffs' Fourth Amendment claim for unlawful arrest should be dismissed.

### 4. Third Claim for Relief: Denial of Medical Care

Plaintiffs' Third Claim for Relief is for "Denial of Medical Care." Compl., ¶¶ 42-49. Plaintiffs allege that Defendants "did not timely summons medical attention" and failed to "provide timely medical treatment," "causing DECEDENT great bodily harm and death." *Id*., ¶ 45. According to the testimony of Brendelin Branch, after Bennie was shot "[t]he officer walked away. They did not do no mouth to mouth or nothing. They just let him die. They didn't try to bring him back. Maybe he could have lived and been paralyzed. They just let him die." Branch Dep., 193:3-6.

ORDER

- 21

1    "Due process requires that police officers seek the necessary medical attention for a

2    detainee when he or she has been injured while being apprehended by either promptly summoning

3    the necessary medical help or by taking the injured detainee to a hospital." *Maddox v. City of Los*

4    *Angeles*, 792 F.2d 1408, 1415 (9th Cir. 1986). "[A] police officer who promptly summons the

5    necessary medical assistance has acted reasonably for purposes of the Fourth Amendment, even if

6    the officer did not administer CPR." *Tatum v. City & Cty. of San Francisco*, 441 F.3d 1090, 1099

7    (9th Cir. 2006).

8            Here, TPD Sergeant Christopher Martin arrived on the scene seconds after the shooting.

9    Decl. of C. Martin. He has submitted testimony that "slightly more than one minute after the

10    shooting occurred, I requested that South South 911 dispatch medical aid '4 bells', this is another

11    term for priority." *Id.*, ¶ 6. A Tacoma Fire Department Engine arrived approximately seven

12    minutes after the shooting, at 2:47:59 a.m.; and the medic unit arrived at 2:48:53. Decl. of V.

13    Harrington, ¶7.

14            Plaintiffs appear to have abandoned their claim for denial of medical care, raising no

15    argument in their opposition to Defendants' explicit request for dismissal of this claim. *See* Defs.'

16    MSJ at 26-27. Under these undisputed facts, such claims would in any event fail. There can be no

17    doubt that officers on the scene "promptly summons the necessary medical assistance" by

18    requesting 911 priority medical aid "slightly more than one minute after the shooting occurred."

19    Plaintiffs' Third Claim for Relief is dismissed.

20            **5.  Seventh Claim for Relief: Negligence**

21            Plaintiffs' Seventh Claim for Relief, against both Defendants, is for "Negligence." Compl.

22    ¶¶ 74-78. Plaintiffs articulate a number of bases for their negligence claim, including the "failure

23    to properly and adequately train employees," "the negligent tactics and handling of the situation

24    ORDER

25    - 22

1  with DECEDENT, including pre-shooting negligence," "the failure to provide prompt medical

2  care," and "the failure to properly train and supervise employees," among several others. *See*

3  Compl. ¶ 75. In response to Defendants' motion seeking dismissal of the negligence claim based

4  on any and all of these grounds, however, Plaintiffs defend only their negligence claim based on

5  "Officer Bradley's direct interaction with Decedent," including "mistaking Decedent for being

6  armed with a gun at the time of the shooting, [] mistaking him for allegedly reaching for his

7  waistband or pant's [*sic*] pocket, allegedly not recognizing that Decedent was running away from

8  the officers prior to the time of the shooting, or that his back was to the officers just before the

9  shooting, [] not giving a verbal warning that deadly force would be used before shooting Decedent,

10  despite it being feasible to do so, and [] not using available less lethal alternatives such as giving

11  additional commands or a verbal warning, giving chase, waiting for the additional officers to

12  arrive, after requesting backup, which was on its way, and setting up a perimeter so Decedent could

13  not get away." Pls.' Resp. at 23. Plaintiffs explicitly abandon any theories of direct liability against

14  the City of Tacoma and assert their claims against the city are limited to its vicarious liability as

15  the officers' employer.[6] *Id.*

16         To establish a claim for negligence, a plaintiff must demonstrate: "(1) the existence of a

17  duty owed to the complaining party; (2) a breach of the duty; (3) resulting injury; and (4) that the

18  breach was the proximate cause of the injury." *Folsom v. Burger King,* 135 Wn.2d 658 (1998); *see*

19  *also Stalter v. State,* 151 Wn.2d 148 (2004). Because "a negligence action will not lie if a defendant

20  owed a plaintiff no duty of care, the primary question is whether a duty of care existed." *Folsom,*

21  135 Wn.2d at 671. "The existence of a duty is a question of law." *Id.*

22

23  ───────────────

[6]The Court therefore deems any direct negligence claims against the City, such as such as failure to train, forfeited.

24  ORDER

25  - 23

In their Motion for Summary Judgment, Defendants argue that "[t]he evidence unequivocally establishes that the Officers' attempts to detain and arrest Bennie, as well as their uses of force were all intentional acts and as such, these acts cannot serve as the basis for a negligence claim." Defs.' MSJ at 28.[7] The Washington Supreme Court has made it clear, however, that "a valid intentional tort claim for excessive force has no bearing on the viability of [a] negligence claim for violation of the duty to act reasonably." *Beltran-Serrano v. City of Tacoma,* 193 Wn.2d 537, 547 (2019) ("An intentional tort claim does not foreclose a negligence claim premised on the failure to use reasonable care to avoid the use of force.") (capital letters altered). This is so, both because theories of recovery may be pursued in the alternative, and because the defendant's actions leading up to the apparently intentional act(s) may themselves be found negligent. *Id.* at 545, 546 ("[N]egligent acts leading up to the ultimate use of force may be delineated from the use of force itself," and negligence claims based on such acts "require consideration of the totality of the circumstances involved in the encounter between [the officer and decedent], and identify "potential negligence in the series of actions leading up to the decision to shoot."). Thus Plaintiffs' negligence claims based on, for example, the officers' alleged failure to "recogniz[e] that Decedent was running away from the officers prior to the time of the shooting" are not precluded simply because the events culminated in an intentional act.

---

[7] Defendants also seek dismissal of any negligence claims based on any allegedly "negligent tactics" and "pre-shooting negligence," arguing that Plaintiffs failed to provide any response to Defendants' Interrogatory No. 17: "Identify each act that you assert was "negligent tactics and handling" or "pre-shooting negligence" as stated in paragraph No. 75(e) of the Complaint." *See* Pls.' Resp. to Sec. Set of Interrogatories, Ex. 10 to Yotter Decl. The Court denies Defendants' request for dismissal of Plaintiffs' negligence claims on these grounds. There is no evidence that Defendants pursued a motion to compel a response, or that Plaintiffs defied a court order compelling a response, and dismissal of these claims is too severe a sanction for this putative discovery violation. More importantly, there is (and could be) no credible claim that Plaintiffs' failure to respond caused Defendants any surprise or prejudice. They have been on notice since the filing of this lawsuit of the factual basis of Plaintiffs' claims.

ORDER

- 24

1    In their Reply brief, Defendants raise an additional argument for dismissal of Plaintiffs'

2   common law negligence claims, not raised in their motion: that Plaintiffs cannot establish the

3   requisite element of the existence of a duty. Defendants claim this is so for two reasons. First,

4   Defendants argue that the public duty doctrine applies to bar claims against government officials

5   for breaches of a duty generally owed the public. Second, Defendants argue that Plaintiffs have

6   failed to present expert testimony establishing the applicable standard of care, which they argue is

7   required to prove a negligence claim in the law enforcement context. *See* Defs.' Rep. at 17-18.

8    These arguments are raised for the first time in a reply brief and therefore need not be

9   considered. *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("district court need not

10   consider arguments raised for the first time in a reply brief."). Moreover, Defendants' additional

11   arguments are substantively unavailing. The public duty doctrine does not apply to the facts and

12   claims of this case. As the Washington Supreme Court recently reiterated, "police owe a duty of

13   reasonable care in the exercise of their official duties. . . . This duty applies in the context of law

14   enforcement and encompasses the duty to refrain from directly causing harm to another through

15   affirmative acts of misfeasance." *Mancini v. City of Tacoma*, 196 Wn.2d 864, 879 (2021) (citing

16   *Beltran-Serrano*, 193 Wn.2d at 550). The public duty doctrine might relieve public officials of

17   liability for failure "to protect a plaintiff from harm caused by a third party or entity," or from

18   "claims based on an alleged breach of special governmental obligations [that] are imposed by

19   statute or ordinance." *Mancini,* 196 Wn.2d 885–86 (citing, inter alia, *Munich v. Skagit Emergency*

20   *Commc'n Ctr.*, 175 Wn.2d 871, 874 (2012)); *Norg v. City of Seattle*, 200 Wn.2d 749, 758 (2023).

21   These are not the circumstances presented in this case, however, and the Washington Supreme

22   Court "has never held that a government did not have a *common law* duty solely because of the

23   public duty doctrine." *Beltran-Serrano,* 193 Wn.2d at 549-551 ("[T]ort liability for negligent law

24   ORDER

25   - 25

1    enforcement activities is consistent with the public duty doctrine.") (citations omitted). The

2    doctrine does not apply in this case to bar Plaintiffs' negligence claims based on a breach of a duty

3    of reasonable care.

4         Second, Defendants argue that "the applicable standard of care for police conduct under

5    the circumstances Officer Bradley was presented with must be proved with expert testimony,"

6    which Plaintiffs, they claim, have failed to provide. Defs.' Rep. at 18. In support of this

7    proposition, Defendants cite a 1982 case from the District of Columbia Court of Appeals (not the

8    D.C. Circuit) discussing the standard of care applicable to an attorney malpractice action; and a

9    Washington Court of Appeals criminal case discussing whether expert opinion on the cause of

10   death in a homicide might be "helpful" to a jury—not whether it is required. Defs.' Rep on MSJ

11   at 19 (citing *O'Neil v. Bergan*, 452 A.2d 337, 341 (D.C. 1982); *State v. Jones*, 59 Wn. App. 744,

12   750 (1990)). Even assuming the accuracy of the premise that expert testimony in the instant case

13   is required, which the Court does not decide,[8] by raising this argument for the first time in their

14   reply brief, Defendants have deprived Plaintiffs of the opportunity to present to the Court the

15   allegedly necessary testimony. Plaintiffs' expert's report is not before the Court, nor is anything

16   other than a small excerpt of his deposition testimony. It is impossible for the Court to determine,

17   therefore, whether the testimony that Defendants claim is lacking is, in fact, lacking. Defendants'

18   ill-considered request for dismissal of Plaintiffs' negligence claims on these grounds is also denied.

19

20

21   _____

22   [8] *See Mancini*, 196 Wn.2d at 887, n. 13 ("The dissent is correct that expert testimony is admissible to help the jury
     assess the reasonableness of police conduct. . . . But '[a]s a general proposition, expert testimony is not required to
     establish a standard of care in an action for negligence.' . . . The dissent does not show that we should, for the first
23   time, *require* this type of expert testimony to establish a professional malpractice standard of care for police
     officers.") (citations omitted).

24   ORDER

25   - 26

### 6.   Eighth Claim for Relief: Negligent Inflction of Emotional Distress

Plaintiffs' Ninth Claim for Relief is for "Negligent Inflction of Emotional Distress," brought on behalf of Brendelin Branch only. Compl. ¶¶ 82-88. Plaintiffs allege that Defendants' actions negligently caused Brendelin "serious emotional distress, including but not limited to, suffering anguish, fright, horror, nervousness, grief, anxiety, worry, shock, humiliation, and shame," and that "an ordinary reasonable person would be unable to cope with seeing their son fatally shot multiple times by the police, including four (4) shots to his back." *Id*. Defendants seek dismissal of this claim on the grounds that it was "not foreseeable that [Brendelin] was a family member associated with Bennie." Defs.' MSJ at 30.

"[T]he tort of negligent infliction of emotional distress is a limited, judicially created cause of action that allows a family member to a recovery for 'foreseeable' intangible injuries caused by viewing a physically injured loved one shortly after a traumatic accident." *Colbert v. Moomba Sports, Inc.*, 163 Wn.2d 43, 45 (2008). While the claim is "limited," there is a dearth of cases in Washington supporting Defendants' proposition that to recover on a bystander theory for negligent infliction of emotional distress, Brendelin must prove it was foreseeable to Defendants that she might be Bennie's mother. In fact, Washington law does not apparently limit such claims only to parents, or even to *close* relatives. *See Percival ex rel. Est. of Wilson v. Gen. Elec. Co*., 708 F. Supp. 2d 1171, 1177 (W.D. Wash. 2010) ("[T]he Washington State Supreme Court requires that a bystander be a "relative" or "family member" of the person harmed in the accident and that the person suffer the shock and trauma associated with the accident in order to recover for negligent infliction of emotional distress. . . . The court has not further limited the class of plaintiffs that are "family members" able to recover for negligent infliction of emotional distress.") (citing, inter alia, *Colbert*, 163 Wn.2d at 49.). Where Washington courts have imposed some limitations on who can

ORDER

- 27

1    recover on the bystander theory, but not the limits that Defendants propose, the Court declines to

2    write such requirements into Washington law. Their motion for summary judgment on Plaintiffs'

3    Negligent Infliction Claim is denied.

4        **7.   Fourth Claim for Relief: Substantive Due Process**

5            The Complaint includes a claim based on the Due Process Clause of the Fourteenth

6    Amendment, asserted on behalf of both Plaintiffs. Compl. ¶¶ 50-61. Defendants seek dismissal of

7    all such claims. In response, Plaintiffs confirm that the "Fourteenth Amendment claim is only

8    being brought on behalf of Ms. Branch." Pls.' Resp. at 21; s*ee Curnow v. Ridgecrest Police,* 952

9    F.2d 321, 325 (9th Cir.1991) (A "parent has a constitutionally protected liberty interest under the

10   Fourteenth Amendment in the companionship and society of his or her child.").[9] They claim that

11   Bradley's actions were "willful, wanton, malicious, and done with reckless disregard for the rights

12   and safety" of the Plaintiffs. Compl. ¶ 59.

13           "[O]nly official conduct that 'shocks the conscience' is cognizable as a due process

14   violation." *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008) (citations omitted). Where, as

15   here, the officers faced "an evolving set of circumstances that took place over a short time period

16   necessitating 'fast action' and presenting 'obligations that tend to tug against each other,'" the

17   shocks-the-conscious standard is met by a showing that a defendant acted not merely with

18   deliberate indifference, but with an actual purpose "to cause harm unrelated to the legitimate object

19   of arrest." *Id*. at 1139-40 (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 853 (1998)). "The

20   purpose-to-harm standard is a subjective standard of culpability," which may be met by evidence

21   that the use of force is meant, for example, only to "teach a suspect a lesson" or to "get even." *A.D.*

22

23   [9] Defendants' assertion (at Defs.' Rep. at 1) that Plaintiffs have abandoned this claim by failing to address it in their Response is incorrect. *See* Pls.' Resp. at 21-22.

24   ORDER

25    - 28

*v. California Highway Patrol*, 712 F.3d 446, 453 (9th Cir. 2013). Although the claims are analogous, a "different standard of culpability" applies to a Fourteenth Amendment claim than to one brought under the Fourth Amendment. *Id.*; *S.R. Nehad v. Browder*, 929 F.3d 1125, 1139 (9th Cir. 2019) ("[A]n unreasonable use of force does not necessarily constitute a Fourteenth Amendment substantive due process violation.").

In response to Defendants' argument, Plaintiffs merely reiterate the facts the Court has already articulated above, and states in conclusory fashion that "a rational jury could find" that they meet the purpose-to-harm standard. But Plaintiffs have presented no evidence supporting even an inference that Bradley acted with a purpose other than with a "legitimate object of arrest"—*e.g.*, that he intended to teach Bennie a lesson or get even, or with some other wholly improper ulterior purpose. Even based on Plaintiffs' version of events, Bradley's intent was to stop a fleeing, unarmed suspect. Whether or not these actions were constitutional under the Fourth Amendment, there is simply no evidence supporting an inference that they were subjectively motivated by anything other than a legitimate law enforcement purpose. Plaintiffs' Due Process claims are dismissed.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss is DENIED. Defendant's Motion for Summary Judgment is GRANTED IN PART and DENIED. The following claims are dismissed:

(1) First Claim for Relief: Unreasonable Search and Seizure

(2) Third Claim for Relief: Denial of Medical Care

(3) Fourth Claim for Relief: Substantive Due Process

ORDER
- 29

1    Defendants' Motion for Summary Judgment as to Plaintiffs' remaining claims is DENIED,

2    except as explicitly set forth herein.

3    DATED this 25th day of April, 2023.

4

5    _____
     Barbara Jacobs Rothstein
6    U.S. District Court Judge

ORDER

- 30